IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Mark Ballard, ) | |
| ) | |
| Petitioner, ) | |
| ) | No. 06 C 711 |
| vs. ) | |
| ) | Hon. Mark Filip |
| Guy Pierce, Warden, ) | |
| ) | |
| Respondent. ) | |

MEMORANDUM OPINION AND ORDER DISMISSING
PETITION FOR WRIT OF HABEAS CORPUS

Mark Ballard ("Ballard" or "Petitioner") has filed a petition for a writ of habeas corpus against Respondent Guy Pierce, Warden of the Pontiac Correctional Center in Pontiac, Illinois. Petitioner is serving a sentence of life imprisonment at Pontiac following commutation of his death sentence by former Illinois Governor George H. Ryan as part of his blanket pardon of inmates on death row in Illinois. (D.E. 1.) For the multiple and independent reasons explained below, Petitioner's request for habeas relief is respectfully denied. Petitioner offers no colorable claim of error, and any putative error would be harmless in any event given the overwhelming evidence of Petitioner's guilt of murder and related crimes.

Factual Background

In October 1997, Petitioner was house-sitting for John McGuire ("McGuire") and watching McGuire's dog while McGuire was living with his girlfriend temporarily.[1] (D.E. 15, Ex. C at 8.) Patty Noland ("Noland") had previously lived at McGuire's house, but she had

---

[1] The facts are taken from the Illinois Supreme Court's resolution of Petitioner's direct appeal. *See, e.g., Ashford v. Gilmore*, 167 F.3d 1130, 1131 (7th Cir. 1999) (citing 28 U.S.C. § 2254(e)(1)). Docket entries are designated as "D.E. ___," followed by the appropriate district court docket number.

recently moved out and was living with her boyfriend. (*Id.*)

On October 29, 1997, Petitioner wanted a car and money to buy some drugs, so Petitioner devised a scheme to lure Noland to McGuire's house so that he could rob her. (*Id.* at 8-9.) That afternoon, Petitioner called Noland and suggested that she come to McGuire's house to pick up her clothes. (*Id.* at 9.) Before Noland arrived, it dawned upon Petitioner that Noland would be able to identify him to the police. (*Id.*) Consequently, Petitioner made plans to murder Noland: he hid a bottle of chloroform in a box by the front door, wrapped a hammer in a bath towel and placed it nearby, put a pair of handcuffs in his back pocket, and laid out a blanket in the living room to conceal Noland's body after Petitioner killed her. (*Id.*)

Noland called Petitioner at around 10:30 p.m. to let him know she was on her way to McGuire's house. (*Id.*) Petitioner asked Noland to bring him a soda. (*Id.*) After receiving the call, Petitioner soaked a rag in chloroform. (*Id.*) When Noland came to the house and entered, Petitioner grabbed her and put the chloroform-soaked rag to her face. (*Id.*) The chloroform had no apparent effect, and Noland began struggling, so Petitioner took up the hammer and struck Noland in the head approximately thirty times. (*Id.*) When Petitioner was done, he got up to wash his hands, during which time Petitioner heard Noland mumbling. (*Id.*)

Petitioner attempted to stab Noland with a knife to "finish [her] off," but the blade bent upon impact. (*Id.*) Petitioner then retrieved a three-foot long pry-bar or screwdriver, which he used to strike Noland in the side/rib area a couple of times. (*Id.*)

Petitioner proceeded to take a number of McGuire's things, such as a TV, two VCRs, and a stuffed owl, which he transported to Noland's car. (*Id.*) Worried that Noland's boyfriend might come looking for her, Petitioner wrapped Noland in another blanket and dragged her in front of the couch and out of view from the window. (*Id.*) Noland was still mumbling, so

2

Petitioner put handcuffs on her, thinking she might otherwise get away. (*Id.*) Petitioner set white plastic bags filled with clothes next to Noland and leaned two bicycles against her to conceal her body. (*Id.*) Petitioner turned off the lights, locked up the house, and left in Noland's car. (*Id.*)

McGuire received a telephone call from Petitioner on October 31, 1997. (*Id.*) McGuire asked Petitioner for a ride to the store. (*Id.*) Petitioner drove McGuire to and from the store in Noland's car. (*Id.*) When McGuire asked Petitioner how he was in possession of Noland's car, Petitioner responded that he had dropped Noland off at work. (*Id.*)

On November 4, 1997, McGuire became concerned about his dog because McGuire had been unable to contact Petitioner at the house for a few days. (*Id.*) McGuire went to the house, noticed that his dog had lost a lot of weight, and McGuire also detected a foul odor. (*Id.*) McGuire eventually discovered Noland's body and called authorities. (*Id.* at 10.)

Sergeant Jeffrey A. Driskill ("Sgt. Driskill") of the Hanover Park Police Department was the responding officer and Detective John Dossey ("Det. Dossey") was the lead investigator. (*Id.*) They began the investigation of Noland's murder, with Sgt. Driskill videotaping and detailing the crime scene and the manner in which Noland was killed. (*Id.*)

On November 5, 1997, authorities received confirmation from the medical examiner that the murder victim was in fact Patty Noland. (*Id.*) The autopsy further revealed that Noland had died from "craniocerebral injuries due to multiple blunt-force trauma with the chloroform exposure, and [with] the handcuffed wrists playing a part." (*Id.*) Det. Dossey instructed officers to look for Petitioner. (*Id.*)

On November 7, 1997, at around 8:15 p.m., Broadview police officers arrested Petitioner after a foot pursuit, in possession of Noland's car, on a warrant for unlawful possession of a stolen motor vehicle. (*Id.*) Petitioner was taken to the Broadview police station and was held for

3

pickup by the Hanover Park police. (*Id.*) When Det. Dossey and Detective Edward Piacenza ("Det. Piacenza") arrived, Petitioner immediately told them he was "tired of running" and that he was "glad it was over." (*Id.*)

Petitioner arrived at the Hanover Park police station around 9:45 p.m. (*Id.*) About five minutes later, Det. Dossey administered *Miranda* warnings to Petitioner. (*Id.*) Petitioner acknowledged that he understood his rights and signed a waiver form, whereupon he confessed to Noland's murder as detailed above and to a string of unrelated burglaries. (*Id.*) While Petitioner was being interviewed, Noland's car was inventoried; Petitioner's bloody clothing and tennis shoes were found in the vehicle. (*Id.*) Petitioner identified the blood-stained items as the clothing and shoes that he wore when he killed Noland. (*Id.*)

In the early morning hours of November 8, 1997, Assistant State's Attorney Timothy Diamond ("ASA Diamond") arrived at the station to interview Petitioner. (*Id.*) ASA Diamond informed Petitioner that he was not his attorney, but instead, a prosecutor for the State of Illinois. (*Id.*) Petitioner responded that he understood. (*Id.*) ASA Diamond and Petitioner reviewed Petitioner's signed *Miranda* waiver, confirming Petitioner's understanding of his rights. (*Id.*) Over the course of the next hour or so, Petitioner relayed the facts of his murder of Noland (*id.* at 10, 13), said he knew what he had done was wrong, and said that thought he should die for it. (*Id.* at 13.) From 1:30 a.m. to 4:30 a.m., Petitioner's statement was put into writing; Petitioner reviewed, made corrections to, and signed the statement. (*Id.*)

The detectives believed they could go no further until daylight, when they could search for physical evidence that Petitioner discarded. (*Id.*) Petitioner was placed in a cell and allowed to sleep. (*Id.*) The detectives agreed to meet back at the station later Saturday morning. (*Id.*)

At 6:00 a.m., ASA Diamond telephoned his supervisor, Michael Wolfe ("Wolfe"). (*Id.* at

4

14.) ASA Diamond told Wolfe that Petitioner had given a written confession, and Diamond related the details of that statement to Wolfe. (*Id.*) ASA Diamond further indicated that he would recover the murder weapon, if Petitioner could remember where he had hidden it, and that Diamond wanted to get corroborating information from Petitioner about the burglaries to which he confessed. (*Id.*) Wolfe gave ASA Diamond no explicit instructions; instead, Wolfe authorized ASA Diamond to file charges but left the timing and substance of charges entirely up to ASA Diamond. (*Id.*)

Shortly thereafter, Wolfe called DuPage County State's Attorney Joseph Birkett to apprise him of the status of the case. (*Id.*) State's Attorney Birkett verbally approved Wolfe's decision. (*Id.*) State's Attorney Birkett thereafter spoke with First Assistant State's Attorney John Kinsella, in which the men discussed holding a press conference; they both called Laura Pollastrini ("Pollastrini"), the public information manager at the DuPage County State's Attorney's office, to set up the conference. (*Id.* at 15.) Pollastrini completed the press release at around 1:00 p.m.; it was released to the media and, shortly thereafter, was read at a press conference. (*Id.*) The press release stated:

> Joe Birkett, State's Attorney of DuPage County, along with Hanover Park Police Chief Phillip Bue announced today that First Degree Murder charges have been filed this afternoon against Mark C. Ballard, 37, of 5712 Bedford Court, Hanover Park. He is charged in connection with the death of Patricia A. Noland, 43, of that same address.

(*Id.*) The press release was mistaken, as charges had not yet been filed. (*Id.*)

Meanwhile, at approximately 10:30 a.m., Petitioner was given breakfast. (*Id.* at 13.) Detectives Dossey and Piacenza again read Petitioner his *Miranda* rights from a preprinted form, which Petitioner thereafter signed in acknowledging waiver of his rights. (*Id.*) As he ate breakfast, Petitioner stated that he remembered what he had done with the hammer and some of the other items the investigators sought. (*Id.*) Petitioner volunteered to take investigators to the

place in Broadview where he had hidden the murder hammer and a few other items. (*Id.*) The detectives, an Assistant State's Attorney, and Petitioner went to Broadview and recovered some evidence. (*Id.*) The individuals stopped for lunch and returned to the station about 3 p.m. (*Id.*) Petitioner voluntarily assisted in identifying certain other items recovered from Noland's car. (*Id.*)

At about 4:00 p.m., Det. Dossey asked Petitioner if he would be willing to go to the scene of Noland's murder and make a videotaped statement there; Petitioner agreed, and volunteered to point out along the way some of the houses he had burglarized. (*Id.*) The videotaped statement was concluded before 4:43 p.m.; when filming concluded, ASA Diamond once again reviewed the *Miranda* warning with Petitioner. (*Id.*) At some point after returning from filming the videotape, ASA Diamond approved the murder charge against Petitioner. (*Id.* at 13.) Det. Dossey served Petitioner with the criminal complaint, and the police did not attempt to elicit any further statements or admissions from Petitioner. (*Id.*) At no time during the multiple *Miranda* warnings and waivers thereof did Petitioner either assert his right to remain silent or request the presence or advice of counsel. (*See generally id.*)

Following a bench trial, Petitioner was convicted of first degree murder, concealment of a homicidal death, unlawful possession of a stolen motor vehicle, and armed robbery. (*Id.* at 8.) As explained by the Supreme Court of Illinois, "[t]he primary evidence used by the State against defendant [*i.e.*, Petitioner] came from defendant's own admissions to his family, friends and to police." (*Id.*) As Petitioner admits in his Petition (and as confirmed by the Illinois Supreme Court's opinion), at trial, Petitioner's "biological father, Charles Stophlet; his cousin, Walter Petersen, Jr.; and McGuire's girlfriend, Judy Mullins, each testified that prior to . . . [Petitioner's] arrest, . . . [Petitioner] had contacted them and admitted to having killed someone." (D.E. 1 at 8;

6

*accord* D.E. 15, Ex. C at 10.) At trial, it was further stipulated that examinations of the crime scene and Noland's car revealed that liquid chloroform had been present, and that Petitioner's clothes were stained with human blood. (*Id.* at 9.) At the bench trial, Petitioner essentially waived any defense, instead presenting purported mitigation evidence, which was also presented at sentencing. (*See id.* at 10.) Petitioner waived a jury for sentencing and the judge sentenced him to death for the murder and to lengthy, concurrent sentences for the other offenses. (*Id.*)

On direct appeal, Petitioner's conviction and sentence were affirmed by the Illinois Supreme Court.[2] (*Id.* at 7.) The Illinois Supreme Court directly addressed Petitioner's Sixth Amendment claim (*id.* at 15-17), identifying the applicable rule of law as coming from *United States v. Gouveia*, 467 U.S. 180, 187-88 (1984).[3] (D.E. 15, Ex. C at 15-16 (also citing *Moran v. Burbine*, 475 U.S. 412, 430 (1986), and *Kirby v. Illinois*, 406 U.S. 682, 888-89 (1972) (plurality opinion).) In applying this rule of law, the Illinois Supreme Court determined that the Sixth Amendment right to counsel does not attach until the initiation of adversarial judicial proceedings. (*Id.* at 16 ("'It is only at that time that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified.'" (quoting *Gouveia* 467 U.S. at 189 (further internal quotation marks and Supreme Court citations omitted).)

The Illinois Supreme Court proceeded to analyze a line of Illinois jurisprudence which further states (perhaps in tension with precedent of the United States Supreme Court) that "'the

---

[2] Although the Illinois Appellate Court hears the vast majority of direct appeals of criminal convictions, Illinois law provides that a defendant who receives a death sentence may appeal directly to the Illinois Supreme Court. 720 ILCS 5/1-1(I); Ill. Sup. Ct. Rule 302(b).

[3] Petitioner raised a number of other arguments relating to his death sentence that are not the subject of this petition and were rendered moot when then-Gov. Ryan commuted his sentence to life imprisonment. (*See* D.E. 1 at 1-2.)

7

level of prosecutorial involvement may be considered in determining whether a defendant's sixth amendment right to counsel has attached.'" (D.E. 15, Ex. C at 16 (quoting *People v. Garrett*, 688 N.E.2d 614, 618 (Ill. 1997).) After analyzing the totality of the evidence, the Illinois Supreme Court determined that the erroneous press release did not establish that Sixth Amendment rights attached. (*Id.* at 16-17.) In this regard, the Illinois Supreme Court, relying on *Hoffa v. United States*, 385 U.S. 293, 310 (1966), explained that Petitioner had no right to demand that the police cease their investigation simply because they already had sufficient evidence to charge him. (*See* D.E. 15, Ex. C at 17 ("'Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.'") (quoting *Hoffa*, 385 U.S. at 310).)

"On January 10, 2003, then-Governor George H. Ryan announced that he was granting 'blanket clemency' for all inmates who were then, or who had been, sentenced to death. He issued orders commuting the sentences of more than 160 inmates to life imprisonment, a maximum of life imprisonment, or 40 years." *People ex rel. Madigan v. Snyder*, 804 N.E.2d 546, 550 (Ill. 2004) (denying petition for writ of mandamus filed by the Illinois Attorney General seeking to block implementation of Governor Ryan's grant of "blanket clemency.") As a result, Petitioner is now serving a term of life imprisonment. (D.E. 1 at 2.) On February 7, 2006, Petitioner filed the instant petition for a writ of habeas corpus. (*Id.*)

Legal Analysis

I. Legal Standard

Petitioner is imprisoned pursuant to a judgment of the Illinois courts that was affirmed by the Illinois Supreme Court. (D.E. 15, Ex. C at 8.) The Illinois Supreme Court reached a decision

8

on the merits of Petitioner's Sixth Amendment claim. (*Id.* at 15-17.)

The grounds upon which a federal district court may issue a writ of habeas corpus for a person imprisoned pursuant to a state court criminal judgment are subject to meaningful limits. Most importantly, the Court is permitted to provide habeas relief "only on the ground that [a prisoner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In other words, a meritorious claim based in federal law is a prerequisite to federal habeas relief.

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), 110 Stat. 1214 (1996), placed further limits on habeas relief. For petitions premised upon legal error, AEDPA requires a petitioner to prove that the challenged judgment is either "contrary to, or involves an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.§ 2254(d).

A judgment is "contrary to" Supreme Court precedent if the state court made a statement of law inconsistent with one made by the Supreme Court, or if the state court decided a case with "materially indistinguishable facts" differently from the Court. *Huynh v. Bowen*, 374 F.3d 546, 548 (7th Cir. 2004) (citing *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). A state court decision is an "unreasonable application of" clearly established law "if the state court identifies the correct governing legal principle from the [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Cossell v. Miller*, 229 F.3d 649, 654 (7th Cir. 2000) (citing *Williams*, 529 U.S. at 413). As the Seventh Circuit has repeatedly instructed, the unreasonable application prong of Section 2254(d)(1) is "a difficult standard to meet." *Floyd v. Hanks*, 364 F.3d 847, 850 (7th Cir.2003) (citation omitted); *Jackson v. Frank*, 348 F.3d 658, 662

9

(7th Cir.2003) (holding that "unreasonable," for the purpose of Section 2254(d)(1), means "something like lying well outside the boundaries of permissible differences of opinion") (internal quotation marks and citation omitted); *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir.2002) (same). In this regard, the Supreme Court has repeatedly instructed that an unreasonable application of federal law is something more than simply an application that the habeas court might not itself have reached in the first instance or that the habeas court thinks is incorrect. *See, e.g., Woodford v. Viscotti*, 537 U.S. 19, 24-25 (2002). For a state court, "[a]voiding these pitfalls does not require citation of our [*i.e.*, the Supreme Court's] cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Schultz v. Page*, 313 F.3d 1010, 1015 (7th Cir. 2002) ("The state court decision is reasonable if it is minimally consistent with the facts and circumstances of the case.") (internal quotation marks and citation omitted).

If a petitioner does not identify "clearly established federal law as determined by the United States Supreme Court," and instead relies upon circuit court precedents, there exists no basis for habeas relief. *See, e.g., Kane v. Espitia*, 126 S. Ct. 407, 408 (2005) (per curiam) (holding that habeas relief is not warranted if prior Supreme Court decision does not provide clear basis for purported constitutional right); *see also Williams*, 529 U.S. at 412 ("[A]s the statutory language makes clear, . . . § 2254(d)(1) restricts the source of clearly established law to this Court's jurisprudence," and the "statutory phrase refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision."); *Yancey v. Gilmore*, 113 F.3d 104, 106 (7th Cir. 1997) (denying habeas relief, even though Seventh Circuit precedent supported petitioner's claim, because "[federal district and appellate courts] may no

longer rely upon our own precedent to grant a writ of habeas corpus") (collecting cases).

Finally, AEDPA requires that a federal court, when considering a habeas petition, must presume that all of the state court's factual determinations, including credibility determinations, are correct, unless rebutted by clear and convincing evidence. *See, e.g.*, 28 U.S.C. § 2254(e)(1); *Murrell v. Frank*, 332 F.3d 1102, 1111 (7th Cir. 2003). The Seventh Circuit has taught that, under AEDPA, the burden on a petitioner seeking to rebut a state court factual finding is a "rigorous" one. *Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999).

II. Discussion

Petitioner maintains that he "was denied his constitutional right to counsel where the prosecution intentionally delayed charging him in order to prevent his right to counsel from attaching until he had given a videotaped statement." (D.E. 1 at 13.) In this regard, and reading Petitioner's arguments charitably in his favor, Petitioner argues that: (1) the Sixth Amendment right to counsel can attach before the formal initiation of adversarial judicial proceedings if "the charging decision [i]s made" and "the adversarial position between [a suspect] and the government [i]s cemented"; and (2) that the DuPage County State's Attorney's Office had decided to charge Petitioner with murder by 8:00 a.m. on November 8, 1997, prior to his videotaped confession. (*Id.* at 14–15.) In particular, he contends that the early-afternoon press release stating that charges had already been filed against him "is significant evidence that the decision had been made and the paperwork was deliberately delayed while the police succeeded in getting a videotaped statement at the scene of the crime, and a tour of houses [Petitioner] burglarized." (*Id.* at 15.) Petitioner thus argues that the statements on the videotape should have been suppressed and that this error requires a new trial. (*See also* D.E. 15, Ex. C at 15 ("[D]efendant now claims that only the videotaped statement that he gave on the afternoon of

11

November 8, 1997, should have been suppressed. Defendant seeks a new trial.").) This claim was raised and adjudicated on the merits in Petitioner's direct appeal to the Illinois Supreme Court. (D.E. 15, Ex. C at 15-17.)

    A.    Petitioner's Claim Fails On The Merits For Multiple, Independent Reasons

        1.    Petitioner Identifies No Legal Error Underlying the Illinois Supreme Court's Judgment

Petitioner advances only a single claim in his Petition, which he titles as follows: "Petitioner was denied his constitutional right to counsel where the prosecution intentionally delayed charging him in order to prevent his right to counsel from attaching until he had given a videotaped statement." (D.E. 1 at 13.) In advancing this position, Petitioner identifies no caselaw, much less a Supreme Court holding, that would suggest that the Illinois Supreme Court's judgment is in error.

The Illinois Supreme Court rejected Petitioner's Sixth Amendment claim, and in doing so, the Illinois Supreme Court directly quoted and applied two Supreme Court decisions. Specifically, the Illinois Supreme Court quoted *United States v. Gouveia*, 467 U.S. 180 (1984), which taught that the Sixth Amendment "'right to counsel attaches at the initiation of adversary judicial criminal proceedings . . . . . It is only at that time that the government has committed itself to prosecute, and only then that the adverse positions of government and the defendant have solidified.'" (D.E. 15, Ex. C at 16 (quoting *Gouveia*, 489 U.S. at 189) (further citations omitted).) The Illinois Supreme Court also quoted from the Supreme Court's teaching in the plurality opinion in *Kirby v. Illinois*, 406 U.S. 682 (1972), where the Supreme Court stated, "'It is at this point . . . that marks the commencement of the "criminal prosecutions" to which alone the explicit guarantees of the Sixth Amendment are applicable.'" (D.E. 15, Ex. C at 16 (quoting *Kirby*, 406 at 690 (plurality opinion)). This Court has no warrant to fault or question the Illinois

12

Supreme Court's rendition of the Supreme Court's teachings in *Gouveia* and *Kirby*, which certainly support the Illinois Supreme Court's holding and judgment. *See, e.g., Gouveia*, 467 U.S. at 187 (holding that the Sixth Amendment "right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant."); *id.* at 187-88 ("'In a line of constitutional cases in this Court stemming back to the Court's landmark opinion in *Powell v. Alabama*, 287 U.S. 45 (1932), it has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him.'") (collecting numerous cases; quoting *Kirby*, 406 U.S. at 688 (plurality opinion)); *Kirby*, 406 U.S. at 689 (plurality opinion) ("All of those cases [*i.e.*, those that have recognized that the Sixth Amendment right to counsel had attached] have involved points of time at or after the initiation of adversary judicial proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment").

Petitioner offers nothing to question the applicability of this Supreme Court teaching. In fact, of the two legal citations that Petitioner offers in his Petition (*see* D.E. 1 at 13), other than citations to the underlying Illinois opinions in the instant case, the only salient one, *Kirby v. Illinois*, 406 U.S. 682 (1972), defeats Petitioner's claim here. There is no question or dispute about the fact that Petitioner had not been charged at the time of the videotaped confession, and thus the Petition fails.

## 2. Even If The Sixth Amendment Right To Counsel Could Attach Before The Initiation of Adversarial Judicial Proceedings, The Illinois Supreme Court Found That No Right Had Attached In This Case

Nothing in *Gouveia* suggests that informal prosecutorial decisions to charge a defendant—for example, a statement reflected in an erroneously-worded press release—or other prosecutorial involvement in a police investigation is sufficient to ground Sixth Amendment rights before the initiation of adversarial judicial proceedings. Nonetheless, there is some caselaw—for example, of the Illinois courts (*see* D.E. 15, Ex. C at 16 (citing *People v. Garrett*, 688 N.E.2d 614 (Ill. 1997))—which suggests, perhaps in tension with Supreme Court teaching, that the Sixth Amendment right to counsel may be implicated if there has been "'significant prosecutorial involvement at the time of the questioned action or if the government has committed itself at that time to prosecute defendant.'" (D.E. 15, Ex. C at 16 (quoting *Garrett*, 688 N.E.2d at 618)).

The Illinois Supreme Court considered this issue, and found that on the record in this case, no Sixth Amendment right to counsel attached prior to the initiation of charges against Petitioner. (D.E. 15, Ex. C at 16-17.) The Illinois Supreme Court noted that ASA's Diamond's receipt of authority to charge Petitioner was distinct from the decision whether actually to charge him. (*Id.* at 16.) Furthermore, the Illinois Supreme Court noted that "[ASA] Diamond was authorized to charge defendant when Diamond believed the investigation was complete. Wolfe never instructed Diamond to charge defendant at a particular time." (*Id.* at 16-17.) The Illinois Supreme Court also considered the materiality of the press release and concluded that it did not trigger Sixth Amendment rights. (*Id.* at 17.) The Illinois Supreme Court stated

> in the course of a criminal investigation, there likely exists an *expectation* that charges will be filed pending its conclusion. However, this does not mean that whenever the police or prosecutors investigate criminal activity and announce that charges are expected to be filed "the government has committed itself at that time to prosecute defendant."

14

(*Id.* (emphasis in *Ballard*; quoting *Garrett*, 688 N.E.2d at 619).) Finally in this regard, the Illinois Supreme Court noted that Supreme Court precedent refuted a premise of Petitioner's Sixth Amendment argument—*i.e.*, Petitioner's contention that the police erred and had no legitimate reason to delay charging Petitioner because there was sufficient evidence to charge him already and further investigation would yield little information that would be relevant to the charging decision. (D.E. 15, Ex. C at 17.) Specifically, the Illinois Supreme Court noted that *Hoffa v. United States*, 385 U.S. 293 (1966), made clear that the police are not required to halt an investigation when they assemble enough evidence to constitute probable cause. (D.E. 15, Ex. C at 17 (quoting *Hoffa*, 385 U.S. at 310).)

At the conclusion of its analysis, the Illinois Supreme Court held, in affirming the factual finding of the trial court, that "prosecutors did not intentionally and unreasonably delay charging defendant in order to deny him his sixth amendment right to counsel." (D.E. 15, Ex. C at 17.) Under AEDPA, this issue is not legally material, because Petitioner has identified no Supreme Court precedent that would allow a Sixth Amendment right to counsel to attach based on prosecutorial involvement prior to the initiation of adversarial judicial proceedings. However, even if such a right could be shown under such circumstances, Petitioner has shown nothing that would allow this Court to conclude that the factual finding of the Illinois Courts is incorrect. Under AEDPA, state court factual findings are presumed correct unless rebutted by clear and convincing evidence. *See, e.g.*, 28 U.S.C. § 2254(e)(1); *Murrell*, 332 F.3d at 1111. Petitioner has adduced no such evidence so as to call into question the judgment of the Illinois courts. As a result, his Petition fails on this independent basis.

### 3. Even If a Sixth Amendment Right to Counsel Had Somehow Attached, Petitioner Waived It

In the Petition, Petitioner recounts the events of November 8, 1997. (D.E. 1 at 13-14.) Petitioner notes that by 8 or 9 a.m. that morning, supervisory prosecutors in DuPage County were instructing the press office of the Du Page County States Attorney's Office to prepare a release reflecting that charges were filed against Petitioner on the afternoon of November 8, 1997. (*Id.* at 14.) From this, Petitioner asserts that "[t]he foregoing facts establish that the charging decision was made early on November 8, 1997." (*Id.*)

As stated above, under AEDPA, the Illinois Supreme Court certainly was entitled to conclude that *Gouveia* and related Supreme Court caselaw render informal decisions about whether to likely, probably, or definitely charge Petitioner irrelevant for Sixth Amendment purposes, and that the relevant point in time is when adversarial judicial proceedings have actually been initiated. Nonetheless, to the extent Petitioner were correct, such that his Sixth Amendment right to counsel had attached by 8 a.m. on November 8, 1997 (*see id.* at 15), the record nonetheless establishes that Petitioner thereafter made at least one and seemingly two waivers of his putative right to counsel after it allegedly attached.

In this regard, the Sixth Amendment right to counsel during questioning can, like most other constitutional rights, be waived. *Michigan v. Harvey*, 494 U.S. 344, 352 (1990) ("We have already held that a defendant whose Sixth Amendment right to counsel has attached by virtue of an indictment may execute a knowing and intelligent waiver of that right in the course of a police-initiated interrogation.") (citing *Patterson v. Illinois*, 487 U.S. 285 (1988)). Furthermore, Supreme Court precedent teaches that a *Miranda* waiver of the Fifth Amendment right to counsel works a coincident waiver of any Sixth Amendment right to counsel. *See, e.g., Patterson*, 487 U.S. at 298 ("[W]hatever warnings suffice for *Miranda*'s purposes will also be sufficient in the

context of postindictment questioning."); *see also id.* at 300 (stating that, "[b]ecause the role of counsel at questioning is relatively simple and limited, we see no problem in having a waiver procedure at that stage which is likewise simple and limited. So long as the accused is made aware of the 'dangers and disadvantages of self-representation' during postindictment questioning, by use of the *Miranda* warnings, his waiver of his Sixth Amendment right to counsel at such questioning is 'knowing and intelligent.'")

*Patterson* likewise independently defeats Petitioner's Sixth Amendment claim. At the time Petitioner contends his Sixth Amendment right attached, at approximately 8 a.m. on November 8, 1997 (D.E. 1 at 15), Petitioner was asleep in a jail cell. (D.E. 15, Ex. C at 13.) At approximately 10:30 a.m., Petitioner was awake and had been given breakfast. At that time, he waived his *Miranda* rights (for at least the third time) with Detectives Dossey and Piacenza. (*Id.*) Petitioner then informed the detectives that he had remembered where he had hidden the hammer and some other evidence. (*Id.*) Petitioner volunteered to take the investigators to where the items were located, and after Petitioner took a shower, Petitioner, the Detectives, and Assistant State's Attorney Diamond drove to recover some of the evidence. (*Id.*) The group stopped for lunch and eventually returned to the police station; after Petitioner used the washroom, he voluntarily assisted investigators in identifying other items from Noland's car. (*Id.*)[4] Later, at 4 p.m. or so, Petitioner agreed to make the challenged videotaped statement at the crime scene, where a videotaped statement was recorded. (*Id.*) At the conclusion of the video, ASA Diamond again reviewed the *Miranda* warning with Petitioner (*id.*)—which was at least his

---

[4] Petitioner only seeks suppression of the videotaped statement made at approximately 4:30 p.m. on November 8, 1997. (*See* D.E. 1 at 13 ("Petitioner was denied his constitutional right to counsel where the prosecution intentionally delayed charging him in order to prevent his right to counsel from attaching until he had given a videotaped statement."); *accord* D.E.15, Ex. C at 15 ("[D]efendant now claims that only the videotaped statement that he gave on the afternoon of November 8, 1997, should have been suppressed.").)

17

fourth *Miranda* waiver and his second *Miranda* waiver after 8 a.m. on November 8, 1997.

Thus, even if the Sixth Amendment right attached by 8 a.m. on November 8, 1997, Petitioner waived it. Petitioner does not claim or even suggest that his Miranda waivers were anything but knowing, voluntary, and intelligent. The Court thus concludes that, under the teachings of the Supreme Court in *Patterson*, Petitioner waived whatever alleged Sixth Amendment right to counsel (there is none under the law) allegedly attached on account of the State's Attorney's Office's "charging decision" on the morning of November 8, 1997.

B.  Any Conceivable Error Is Harmless In Any Event

Even if one were to assume *arguendo* that the trial court erred when it admitted Petitioner's videotaped statement (and no error has been shown in that regard), such a putative error was harmless under the teachings of *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Under *Brecht*, constitutional error is harmless in the federal habeas setting if it did not have a "'substantial and injurious effect or influence'" on the verdict. *Id.* at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). The government has discharged its burden of proving harmlessness under the *Brecht* standard.

Prior to Petitioner's videotaped statement, he confessed orally and in writing—to a variety of family members, friends, and law enforcement officers. (D.E. 15, Ex. C at 10.) These confessions included three confessions to friends and/or family members who testified at trial, in which confessions Petitioner admitted to killing someone. (*Id.*) Following the murder (which occurred in the house where Petitioner was then residing), Petitioner was seen in the victim's car, and he falsely stated that he had driven the victim to work—after he had already killed her. (*Id.* at 9.) When arrested, in possession of the murder victim's car, Petitioner told two police officers that he was "glad it was over" and that he was "tired of running." (*Id.* at 10.)

18

Petitioner then gave a full oral confession to the Noland murder, after being *Mirandized*, to two detectives. (*Id.*) Police retrieved from Noland's car Petitioner's bloody clothes and tennis shoes that he wore during the murder, and subsequent tests confirmed that the clothes were stained with human blood and that there had been chloroform at the scene as Petitioner had stated. (*Id.*)

Following his oral confession, Petitioner made a full written confession, again after waiving his *Miranda* rights, to an Assistant State's Attorney. (*Id.* at 10, 13.) Petitioner has not even suggested that there is any defect with any of the aforementioned confessions or other lines of evidence. (*See* D.E. 1.) At trial, Petitioner introduced other evidence that essentially conceded his guilt (*e.g.*, rank hearsay, which the trial judge nonetheless accepted, from a third-party which related that Petitioner had stated that he had expressed remorse for what he had done) (*see* D.E. 15, Ex. C at 11)—evidence which would later also be offered in mitigation at the penalty phase. (*Id.*)

Under any fair standard, this evidence is overwhelming evidence of Petitioner's guilt. Any conceivable impact of the videotaped confession is not material to any rational assessment of guilt or innocence. The videotaped confession was at least the *sixth* confession in the case, and likely is more fairly characterized as the seventh confession if one includes Petitioner's post-*Miranda* admissions to detectives on the morning of November 8, 1997, in which Petitioner helped the police to recover further evidence against him. Simply put, the videotaped confession, the only evidence challenged here, could not be rationally seen as having any impact on the verdict below. (Indeed, any cumulative admissions following Petitioner's written confession to an Assistant States Attorney, complete oral confession to two detectives, and triple confessions to having killed someone to family members and/or friends, could not realistically be seen as

19

material.)[5]

In light of the overwhelming evidence of guilt in the case, the admission of the videotaped statement did not have a substantial and injurious effect or influence on the verdict. The same conclusion would be true if Petitioner had claimed (he has not) that evidence collected after 8 a.m. on the morning of November 8, 1997, but prior to the issuance of the press release at approximately 1 p.m. (essentially the admissions that led to the recovery of the hammer and additional physical evidence) should be excluded under the Sixth Amendment. Again, by the time Petitioner went to sleep in the early morning of November 8, 1997, his admissions to law enforcement, his prior admissions to third-party friends and family members, and the other physical evidence the police had collected overwhelmingly established his guilt beyond a reasonable doubt.

## Conclusion

For the aforementioned and independent reasons, federal habeas relief not warranted. Consequently, the Petition for a writ of habeas corpus is respectfully denied.

So ordered.

*Mark Filip*
Mark Filip
United States District Judge
Northern District of Illinois

Dated: 5/30/06

---

[5] In addition, as alluded to above, prior to the videotaped confession, Petitioner also waived his *Miranda* rights again and took the police to places where they could recover the hammer and other further evidence. (D.E. 15, Ex. C at 13.) Petitioner does not appear to challenge this evidence, which if included provides further overwhelming evidence of his guilt of the murder. (*Accord id.* at 15 ("Defendant now claims that only the videotaped statement that he gave on the afternoon of November 8, 1997, should have been suppressed.").) Such evidence (*i.e.*, the hammer and other items recovered on the morning of November 8, 1997) is not necessary by any means—the harmlessness threshold is crossed far sooner given the record in the case—but it provides further support for the harmlessness conclusion.