IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Mark Ballard, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 06 C 711 |
| vs. | ) | |
| | ) | Hon. Mark Filip |
| Guy Pierce, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

MEMORANDUM OPINION DENYING APPLICATION
FOR A CERTIFICATE OF APPEALABILITY

On May 30, 2006, the Court denied Mark Ballard's ("Ballard") Petition for a Writ of Habeas Corpus. (D.E. 16, 17.[1]) Ballard subsequently filed a notice of appeal and an application for a Certificate of Appealability ("COA"). (D.E. 19-21.) For the reasons explained below, Mr. Ballard's request for a COA is respectfully denied. Simply put, the single claim in Mr. Ballard's habeas petition was meritless for multiple, independent reasons; moreover, even if Mr. Ballard had shown any error (and he did not), that putative error, concerning a piece of cumulative evidence in an otherwise overwhelming case, would be harmless under applicable legal standards.

---

[1] This opinion draws from the Court's prior opinion rejecting Mr. Ballard's petition for a writ of habeas corpus; however, this opinion focuses on evaluating whether the pending request for a Certificate of Appealability is well taken. To the extent the reader is interested, the prior opinion provides a more complete explanation of why the habeas petition was meritless under applicable legal standards.

# BACKGROUND FACTS CONCERNING BALLARD'S MURDER CONVICTION

In October 1997, Ballard was house-sitting for John McGuire ("McGuire") and watching McGuire's dog while McGuire was living with his girlfriend temporarily.[2] (D.E. 15, Ex. C at 8.) Patty Noland ("Noland") had previously lived at McGuire's house, but she had recently moved out and was living with her boyfriend. (*Id.*)

On October 29, 1997, Ballard wanted a car and money to buy some drugs, so Ballard devised a scheme to lure Noland to McGuire's house so that he could rob her. (*Id.* at 8-9.) That afternoon, Ballard called Noland and suggested that she come to McGuire's house to pick up her clothes. (*Id.* at 9.) Before Noland arrived, it dawned upon Ballard that Noland would be able to identify him to the police. (*Id.*) Consequently, Ballard made plans to murder Noland: he hid a bottle of chloroform in a box by the front door, wrapped a hammer in a bath towel and placed it nearby, put a pair of handcuffs in his back pocket, and laid out a blanket in the living room to conceal Noland's body after Ballard killed her. (*Id.*)

Noland called Ballard at around 10:30 p.m. to let him know she was on her way to McGuire's house. (*Id.*) Ballard asked Noland to bring him a soda. (*Id.*) After receiving the call, Ballard soaked a rag in chloroform. (*Id.*) When Noland came to the house and entered, Ballard grabbed her and put the chloroform-soaked rag to her face. (*Id.*) The chloroform had no apparent effect, and Noland began struggling, so Ballard took up the hammer and struck Noland in the head approximately thirty times. (*Id.*) When Ballard was done, he got up to wash his hands, during which time Ballard heard Noland mumbling. (*Id.*)

---

[2] The facts are taken from the Illinois Supreme Court's resolution of Ballard's direct appeal. *See, e.g., Ashford v. Gilmore*, 167 F.3d 1130, 1131 (7th Cir. 1999) (citing 28 U.S.C. § 2254(e)(1)). Docket entries are designated as "D.E. ___," followed by the appropriate district court docket number.

Ballard attempted to stab Noland with a knife to "finish [her] off," but the blade bent upon impact. (*Id.*) Ballard then retrieved a three-foot long pry-bar or screwdriver, which he used to strike Noland in the side/rib area a couple of times. (*Id.*)

Ballard proceeded to take a number of McGuire's things, such as a TV, two VCRs, and a stuffed owl, which he transported to Noland's car. (*Id.*) Worried that Noland's boyfriend might come looking for her, Ballard wrapped Noland in another blanket and dragged her in front of the couch and out of view from the window. (*Id.*) Noland was still mumbling, so Ballard put handcuffs on her, thinking she might otherwise get away. (*Id.*) Ballard set white plastic bags filled with clothes next to Noland and leaned two bicycles against her to conceal her body. (*Id.*) Ballard turned off the lights, locked up the house, and left in Noland's car. (*Id.*)

McGuire received a telephone call from Ballard on October 31, 1997. (*Id.*) McGuire asked Ballard for a ride to the store. (*Id.*) Ballard drove McGuire to and from the store in Noland's car. (*Id.*) When McGuire asked Ballard how he was in possession of Noland's car, Ballard responded that he had dropped Noland off at work. (*Id.*)

On November 4, 1997, McGuire became concerned about his dog because McGuire had been unable to contact Ballard at the house for a few days. (*Id.*) McGuire went to the house, noticed that his dog had lost a lot of weight, and McGuire also detected a foul odor. (*Id.*) McGuire eventually discovered Noland's body and called authorities. (*Id.* at 10.)

Sergeant Jeffrey A. Driskill ("Sgt. Driskill") of the Hanover Park Police Department was the responding officer and Detective John Dossey ("Det. Dossey") was the lead investigator. (*Id.*) They began the investigation of Noland's murder, with Sgt. Driskill videotaping and detailing the crime scene and the manner in which Noland was killed. (*Id.*)

On November 5, 1997, authorities received confirmation from the medical examiner that

the murder victim was in fact Patty Noland. (*Id.*) The autopsy further revealed that Noland had died from "craniocerebral injuries due to multiple blunt-force trauma with the chloroform exposure, and [with] the handcuffed wrists playing a part." (*Id.*) Det. Dossey instructed officers to look for Ballard. (*Id.*)

On November 7, 1997, at around 8:15 p.m., Broadview police officers arrested Ballard after a foot pursuit, in possession of Noland's car, on a warrant for unlawful possession of a stolen motor vehicle. (*Id.*) Ballard was taken to the Broadview police station and was held for pickup by the Hanover Park police. (*Id.*) When Det. Dossey and Detective Edward Piacenza ("Det. Piacenza") arrived, Ballard immediately told them he was "tired of running" and that he was "glad it was over." (*Id.*)

Ballard arrived at the Hanover Park police station around 9:45 p.m. (*Id.*) About five minutes later, Det. Dossey administered *Miranda* warnings to Ballard. (*Id.*) Ballard acknowledged that he understood his rights and signed a waiver form, whereupon he confessed to Noland's murder as detailed above and to a string of unrelated burglaries. (*Id.*) While Ballard was being interviewed, Noland's car was inventoried; Ballard's bloody clothing and tennis shoes were found in the vehicle. (*Id.*) Ballard identified the blood-stained items as the clothing and shoes that he wore when he killed Noland. (*Id.*)

In the early morning hours of November 8, 1997, Assistant State's Attorney Timothy Diamond ("ASA Diamond") arrived at the station to interview Ballard. (*Id.*) ASA Diamond informed Ballard that he was not his attorney, but instead, a prosecutor for the State of Illinois. (*Id.*) Ballard responded that he understood. (*Id.*) ASA Diamond and Ballard reviewed Ballard's signed *Miranda* waiver, confirming Ballard's understanding of his rights. (*Id.*) Over the course of the next hour or so, Ballard relayed the facts of his murder of Noland (*id.* at 10, 13), said he

knew what he had done was wrong, and said that thought he should die for it. (*Id.* at 13.) From 1:30 a.m. to 4:30 a.m., Ballard's statement was put into writing; Ballard reviewed, made corrections to, and signed the statement. (*Id.*)

The detectives believed they could go no further until daylight, when they could search for physical evidence that Ballard discarded. (*Id.*) Ballard was placed in a cell and allowed to sleep. (*Id.*) The detectives agreed to meet back at the station later Saturday morning. (*Id.*)

At 6:00 a.m., ASA Diamond telephoned his supervisor, Michael Wolfe ("Wolfe"). (*Id.* at 14.) ASA Diamond told Wolfe that Ballard had given a written confession, and Diamond related the details of that statement to Wolfe. (*Id.*) ASA Diamond further indicated that he would recover the murder weapon, if Ballard could remember where he had hidden it, and that Diamond wanted to get corroborating information from Ballard about the burglaries to which he confessed. (*Id.*) Wolfe gave ASA Diamond no explicit instructions; instead, Wolfe authorized ASA Diamond to file charges but left the timing and substance of charges entirely up to ASA Diamond. (*Id.*)

Shortly thereafter, Wolfe called DuPage County State's Attorney Joseph Birkett to apprise him of the status of the case. (*Id.*) State's Attorney Birkett verbally approved Wolfe's decision. (*Id.*) State's Attorney Birkett thereafter spoke with First Assistant State's Attorney John Kinsella, in which the men discussed holding a press conference; they both called Laura Pollastrini ("Pollastrini"), the public information manager at the DuPage County State's Attorney's office, to set up the conference. (*Id.* at 15.) Pollastrini completed the press release at around 1:00 p.m.; it was released to the media and, shortly thereafter, was read at a press conference. (*Id.*) The press release stated:

Joe Birkett, State's Attorney of DuPage County, along with Hanover Park Police

> Chief Phillip Bue announced today that First Degree Murder charges have been filed this afternoon against Mark C. Ballard, 37, of 5712 Bedford Court, Hanover Park. He is charged in connection with the death of Patricia A. Noland, 43, of that same address.

(*Id.*) The press release was mistaken, as charges had not yet been filed. (*Id.*)

Meanwhile, at approximately 10:30 a.m., Ballard was given breakfast. (*Id.* at 13.) Detectives Dossey and Piacenza again read Ballard his *Miranda* rights from a preprinted form, which Ballard thereafter signed in acknowledging the waiver of his rights. (*Id.*) As he ate breakfast, Ballard stated that he remembered what he had done with the hammer and some of the other items the investigators sought. (*Id.*) Ballard volunteered to take investigators to the place in Broadview where he had hidden the murder hammer and a few other items. (*Id.*) The detectives, an Assistant State's Attorney, and Ballard went to Broadview and recovered some evidence. (*Id.*) The individuals stopped for lunch and returned to the station about 3 p.m. (*Id.*) Ballard voluntarily assisted in identifying certain other items recovered from Noland's car. (*Id.*)

At about 4:00 p.m., Det. Dossey asked Ballard if he would be willing to go to the scene of Noland's murder and make a videotaped statement there; Ballard agreed, and volunteered to point out along the way some of the houses he had burglarized. (*Id.*) The videotaped statement was concluded before 4:43 p.m.; when filming concluded, ASA Diamond once again reviewed the *Miranda* warning with Ballard. (*Id.*) At some point after returning from filming the videotape, ASA Diamond approved the murder charge against Ballard. (*Id.* at 13.) Det. Dossey served Ballard with the criminal complaint, and the police did not attempt to elicit any further statements or admissions from Ballard. (*Id.*) At no time during the multiple *Miranda* warnings and waivers thereof did Ballard either assert his right to remain silent or request the presence or advice of counsel. (*See generally id.*)

Following a bench trial, Ballard was convicted of first degree murder, concealment of a homicidal death, unlawful possession of a stolen motor vehicle, and armed robbery. (*Id.* at 8.) As explained by the Supreme Court of Illinois, "[t]he primary evidence used by the State against defendant [*i.e.*, Ballard] came from defendant's own admissions to his family, friends and to police." (*Id.*) As Ballard admitted in his Petition (and as confirmed by the Illinois Supreme Court's opinion), at trial, Ballard's "biological father, Charles Stophlet; his cousin, Walter Petersen, Jr.; and McGuire's girlfriend, Judy Mullins, each testified that prior to . . . [Ballard's] arrest, . . . [Ballard] had contacted them and admitted to having killed someone." (D.E. 1 at 8; *accord* D.E. 15, Ex. C at 10.) At trial, it was further stipulated that examinations of the crime scene and Noland's car revealed that liquid chloroform had been present, and that Ballard's clothes were stained with human blood. (*Id.* at 9.) At the bench trial, Ballard essentially waived any defense, instead presenting purported mitigation evidence, which was also presented at sentencing. (*See id.* at 10.) Ballard waived a jury for sentencing and the judge sentenced him to death for the murder and to lengthy, concurrent sentences for the other offenses. (*Id.*)

On direct appeal, Ballard's conviction and sentence were affirmed by the Illinois Supreme Court.[3] (*Id.* at 7.) The Illinois Supreme Court directly addressed Ballard's Sixth Amendment claim (*id.* at 15-17), identifying the applicable rule of law as coming from *United States v. Gouveia*, 467 U.S. 180, 187-88 (1984). (D.E. 15, Ex. C at 15-16 (also citing *Moran v. Burbine*, 475 U.S. 412, 430 (1986), and *Kirby v. Illinois*, 406 U.S. 682, 888-89 (1972) (plurality opinion)).) In applying this rule of law, the Illinois Supreme Court determined that the Sixth Amendment right to counsel does not attach until the initiation of adversarial judicial proceedings. (*Id.* at 16

---

[3] Although the Illinois Appellate Court hears the vast majority of direct appeals of criminal convictions, Illinois law provides that a defendant who receives a death sentence may appeal directly to the Illinois Supreme Court. 720 ILCS 5/1-1(I); Ill. Sup. Ct. Rule 302(b).

("'It is only at that time that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified.'" (quoting *Gouveia* 467 U.S. at 189 (further internal quotation marks and Supreme Court citations omitted).)

The Illinois Supreme Court proceeded to analyze a line of Illinois jurisprudence which further states (perhaps in tension with precedent of the United States Supreme Court) that "'the level of prosecutorial involvement may be considered in determining whether a defendant's sixth amendment right to counsel has attached.'" (D.E. 15, Ex. C at 16 (quoting *People v. Garrett*, 688 N.E.2d 614, 618 (Ill. 1997).) Even within the rubric of this arguably more defendant-friendly method of analysis embodied in some Illinois state decisions, the Illinois Supreme Court determined, after analyzing the totality of the evidence, that the erroneous press release did not establish that any Sixth Amendment rights attached. (*Id.* at 16-17.) The Illinois Supreme Court also explained, relying on *Hoffa v. United States*, 385 U.S. 293, 310 (1966), that Ballard had no right to demand that the police cease their investigation simply because they already had sufficient evidence to charge him. (*See* D.E. 15, Ex. C at 17 ("'Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.'") (quoting *Hoffa*, 385 U.S. at 310).)

"On January 10, 2003, then-Governor George H. Ryan announced that he was granting 'blanket clemency' for all inmates who were then, or who had been, sentenced to death. He issued orders commuting the sentences of more than 160 inmates to life imprisonment, a maximum of life imprisonment, or 40 years." *People ex rel. Madigan v. Snyder*, 804 N.E.2d 546, 550 (Ill. 2004) (denying petition for writ of mandamus filed by the Illinois Attorney General seeking to block implementation of Governor Ryan's grant of "blanket clemency.") As a result,

Ballard is now serving a term of life imprisonment. (D.E. 1 at 2.)

On February 7, 2006, Ballard filed a petition for a writ of habeas corpus (*id.*); the Court denied Ballard's petition on May 30, 2006. (D.E. 16.) Following the denial of his habeas petition, Ballard filed a notice of appeal and an application for a COA. (D.E. 19-21.) Ballard's pending filings present no substantive argument in support of his request for a COA, nor even any contention that the May 30, 2006 opinion denying his habeas petition was erroneous in any way. (*See* D.E. 20 ¶ 3 ("Petitioner Mark Ballard has not filed a motion for reconsideration. It is his intention that this Notice of Appeal shall also stand as an application for [a] Certificate of Appealability.").) The Court will construe this filing generously, and notwithstanding that Ballard offers no argument in support of the grant of a COA, discuss below why a COA is unwarranted under applicable legal standards that govern the case.

I.  Standard of Review

The procedures for appealing the denial of a habeas petition are governed by Fed. R. App. P. 22(b) and 28 U.S.C. § 2253. Rule 22(b) provides that:

> "In a habeas corpus proceeding in which the detention complained of arises from process issued by a state court, or in a 28 U.S.C. § 2255 proceeding, the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c). If an applicant files a notice of appeal, the district judge who rendered the judgment must either issue a certificate of appealability or state why a certificate should not issue."

Section 2253 of Title 28 authorizes a district or circuit judge to issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." When a district court has denied a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a district court has denied a

petitioner's claim on procedural grounds "without reaching the prisoner's underlying constitutional claim," a COA should issue if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the district court was correct in its procedural ruling. *Id.* at 478. While a petitioner seeking a COA need not demonstrate that he will prevail in order to receive a COA, he or she "must prove something more than the absence of frivolity or the existence of mere good faith on his or her part." *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) (internal quotation marks and citation omitted). In assessing the factual basis for a claim, the Court presumes that "[f]actual determinations of a state court are . . . correct and hence not 'unreasonable,' unless a petitioner can show otherwise by clear and convincing evidence." *Conner v. McBride*, 375 F.3d 643, 649 (7th Cir. 2004) (collecting cases).

II.     Analysis

Mr. Ballard offers no argument as to why a COA is warranted, nor does he otherwise attempt to demonstrate why he satisfies applicable legal standards. The Court therefore will simply explain why a COA is unwarranted in this case.

Mr. Ballard's habeas petition maintained that he "was denied his constitutional right to counsel where the prosecution intentionally delayed charging him in order to prevent his right to counsel from attaching until he had given a videotaped statement." (D.E. 1 at 13.) Mr. Ballard's petition argued that he should receive a new trial because his videotaped statements (which were, at a minimum, his *sixth* confession available to the prosecution and the fact-finder, the other five of which were not challenged) should have been suppressed due to the violation of his Sixth Amendment right to counsel. (*See* D.E. 15, Ex. C at 15 ("[D]efendant now claims that only the videotaped statement that he gave on the afternoon of November 8, 1997, should have been

suppressed. Defendant seeks a new trial.").)

The Court's May 30, 2006 order analyzed Mr. Ballard's claim at length and found it meritless for multiple, independent reasons. (D.E. 17.) As explained further below, given the facts of this case, no reasonable jurist could conclude that Mr. Ballard has made anything approaching a "substantial showing of a denial of a constitutional right." *See* 28 U.S.C. § 2253.

First, the Illinois Supreme Court resolution of Mr. Ballard's claim on the merits was not an unreasonable application of clearly established Supreme Court precedent, as is required for habeas relief in the case. (*Id.* at 12-13.) The Illinois Supreme Court rejected Ballard's Sixth Amendment claim, and in doing so, the Illinois Supreme Court directly quoted and applied two Supreme Court decisions. Upon reviewing the Illinois Supreme Court's resolution of Mr. Ballard's claim, the Court found no warrant to fault or question the Illinois Supreme Court's rendition of the Supreme Court's teachings. Moreover, Mr. Ballard's only putative claim (which appeared meritless in any event under any standards) was largely based in Seventh Circuit precedent; under the applicable standards of 28 U.S.C. § 2254, as articulated by Congress in the Antiterrorism and Effective Death Penalty Act of 1996, circuit precedent could provide no basis for habeas relief as it is not a holding of the United States Supreme Court. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 412 ("[A]s the statutory language makes clear, . . . § 2254(d)(1) restricts the source of clearly established law to this Court's jurisprudence," and the "statutory phrase refers to the holdings, as opposed to the dicta, of this Court's decisions at the time of the relevant state-court decision."); *Yancey v. Gilmore*, 113 F.3d 104, 106 (7th Cir. 1997) (denying habeas relief, even though Seventh Circuit precedent supported petitioner's claim, because "[federal district and appellate courts] may no longer rely upon our own precedent to grant a writ of habeas corpus") (collecting cases).

Second, the Illinois Supreme Court made an uncontradicted finding of fact that Mr. Ballard's Sixth Amendment right to counsel had not attached at the time that he made the videotaped statement (again, his sixth confession among a number of other unchallenged confessions to the police and family members). (D.E. 17 at 14 (citing D.E. 15, Ex. C at 16-17).) The Illinois Supreme Court noted that ASA's Diamond's receipt of authority to charge Ballard was distinct from the decision whether actually to charge him. (D.E. 15, Ex. C at 16.) Furthermore, the Illinois Supreme Court noted that "[ASA] Diamond was authorized to charge defendant when Diamond believed the investigation was complete. Wolfe never instructed Diamond to charge defendant at a particular time." (*Id.* at 16-17.) The Illinois Supreme Court also considered the materiality of the press release and concluded that it did not trigger Sixth Amendment rights. (*Id.* at 17.) At the conclusion of its analysis, the Illinois Supreme Court held, in affirming the factual finding of the trial court, that "prosecutors did not intentionally and unreasonably delay charging defendant in order to deny him his sixth amendment right to counsel." (*Id.*) Under AEDPA, state court factual findings are presumed correct unless rebutted by clear and convincing evidence. *See, e.g.*, 28 U.S.C. § 2254(e)(1). Mr. Ballard adduced no such evidence so as to call into question the judgment of the Illinois courts. As a result, the Court denied habeas relief on this independent basis. *Accord, e.g., Murrell v. Frank*, 332 F.3d 1102, 1111 (7th Cir. 2003) (holding that, under AEDPA, state court factual findings are presumed correct unless rebutted by clear and convincing evidence).

Third, even if a Sixth Amendment right to counsel had somehow attached (and Mr. Ballard had offered no persuasive basis to disturb the holding of the Illinois courts that the right to counsel had not attached), Mr. Ballard knowingly waived his right to counsel. (D.E. 17 at 16.) Ballard's petition asserted that "the charging decision was made early on November 8, 1997."

(D.E. 1 at 13.) To the extent Mr. Ballard could possibly be assumed to be correct *arguendo*, such that his Sixth Amendment right to counsel had attached by 8 a.m. on November 8, 1997 (*see id.* at 15), the record established that Mr. Ballard thereafter made at least one and seemingly two waivers of his putative right to counsel after it supposedly had attached. At the time Ballard contended his Sixth Amendment right attached, at approximately 8 a.m. on November 8, 1997 (D.E. 1 at 15), Ballard was asleep in a jail cell. (D.E. 15, Ex. C at 13.) At approximately 10:30 a.m., Ballard was awake and had been given breakfast. At that time, he waived his *Miranda* rights (for at least the third time) with Detectives Dossey and Piacenza. (*Id.*) Precedent teaches that the Sixth Amendment right to counsel during questioning can, like most other constitutional rights, be waived. *See, e.g., Michigan v. Harvey*, 494 U.S. 344, 352 (1990) ("We have already held that a defendant whose Sixth Amendment right to counsel has attached by virtue of an indictment may execute a knowing and intelligent waiver of that right in the course of a police-initiated interrogation.") (citing *Patterson v. Illinois*, 487 U.S. 285 (1988)). Furthermore, Supreme Court precedent teaches that a *Miranda* waiver of the Fifth Amendment right to counsel works a coincident waiver of any Sixth Amendment right to counsel. *See, e.g., Patterson*, 487 U.S. at 298 ("[W]hatever warnings suffice for *Miranda*'s purposes will also be sufficient in the context of postindictment questioning."). After waiving any putative Sixth Amendment rights through his *Miranda* waiver, Ballard then informed the detectives that he had remembered where he had hidden the hammer and some other evidence. (D.E. 15, Ex. C at 13.) Ballard volunteered to take the investigators to where the items were located, and after Ballard took a shower, Ballard, the Detectives, and Assistant State's Attorney Diamond drove to recover some of the evidence. (*Id.*) The group stopped for lunch and eventually returned to the police station; after Ballard used the washroom, he voluntarily assisted investigators in identifying other items from

Noland's car. (*Id.*)[4] Later, at 4 p.m. or so, Ballard agreed to make the challenged videotaped statement at the crime scene, where a videotaped statement was recorded. (*Id.*) At the conclusion of the video, ASA Diamond again reviewed the *Miranda* warning with Ballard (*id.*)—which was at least his fourth *Miranda* waiver and his second *Miranda* waiver after 8 a.m. on November 8, 1997. Ballard does not claim or even suggest that his *Miranda* waivers were anything but knowing, voluntary, and intelligent. Under the precedent cited above, even if a Sixth Amendment right had attached as Ballard claims, he waived such rights twice after they attached. Such waivers provided another, independent basis by which his claim in the habeas petition failed.

Finally, any conceivable error (and there was none shown) was harmless given the overwhelming evidence establishing Mr. Ballard's guilt. (D.E. 17 at 18.) Under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), constitutional error is harmless in the federal habeas setting if it did not have a "'substantial and injurious effect or influence'" on the verdict. *Id.* at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Prior to Mr. Ballard's videotaped statement, he confessed orally and in writing—to a variety of family members, friends, and law enforcement officers. (D.E. 15, Ex. C at 10.) These confessions included three confessions to friends and/or family members who testified at trial, in which confessions Ballard admitted to killing someone. (*Id.*) Following the murder (which occurred in the house where Ballard was then residing), Ballard was seen in the victim's car, and he falsely stated that he had

---

[4] Mr. Ballard only sought suppression of the videotaped statement made at approximately 4:30 p.m. on November 8, 1997. (*See* D.E. 1 at 13 ("Ballard was denied his constitutional right to counsel where the prosecution intentionally delayed charging him in order to prevent his right to counsel from attaching until he had given a videotaped statement."); *accord* D.E.15, Ex. C at 15 ("[D]efendant now claims that only the videotaped statement that he gave on the afternoon of November 8, 1997, should have been suppressed.").)

driven the victim to work—after he had already killed her. (*Id.* at 9.) When arrested, in possession of the murder victim's car, Ballard told two police officers that he was "glad it was over" and that he was "tired of running." (*Id.* at 10.) Ballard then gave a full oral confession to the Noland murder, after being *Mirandized*, to two detectives. (*Id.*) Police retrieved from Noland's car Ballard's bloody clothes and tennis shoes that he wore during the murder, and subsequent tests confirmed that the clothes were stained with human blood and that there had been chloroform at the scene as Ballard had explained. (*Id.*) Following his oral confession, Ballard made a full written confession, again after waiving his *Miranda* rights, to an Assistant State's Attorney. (*Id.* at 10, 13.) Ballard did not in his habeas petition, nor does he now, even suggest that there was any defect with any of the aforementioned confessions or other lines of evidence. (*See* D.E. 1.) Under any fair standard, such evidence is overwhelming evidence of Ballard's guilt of the Noland murder. The videotaped confession—the only evidence challenged in the habeas petition, and at least the *sixth* confession available to the government—could not be rationally seen as having any impact on the verdict below. Even putting aside the disputed evidence, it is clear, beyond any reasonable doubt, that any rational fact-finder would have found that the State discharged its burden of proof in establishing Mr. Ballard's guilt of the crime of murder and thus any alleged error was harmless.

CONCLUSION

For the aforementioned reasons, Mr. Ballard has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253. The Court, in denying his habeas application, identified four adequate and independent reasons why Mr. Ballard's purported claim was meritless. Mr. Ballard's application for a COA does not address the Court's opinion and otherwise failed to meet the applicable standards for issuance of a COA. The application for a Certificate of Appealability is respectfully denied.

_____
Mark Filip
United States District Judge
Northern District of Illinois

Dated: 7-11-06